# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

SOUTHERN GARDENS CITRUS
PROCESSING CORPORATION,

     Plaintiff,

v.                                         Case No.:  2:11-cv-377-38UAM
                                                     LEAD

BARNES RICHARDSON & COLBURN and
MATTHEW T. MCGRATH, individually,

     Defendants.

_____/

A.DUDA & SONS, INC.,

     Plaintiff,

v.                                           Case No.:  2:11-cv-378-38UAM
                                                  MEMBER

BARNES RICHARDSON & COLBURN and
MATTHEW T. MCGRATH, individually,

     Defendants.

_____/

## <u>ORDER</u>[1]

    This matter comes before the Court on Defendants' Motion for Summary

Judgment (Doc. #154) filed on September 30, 2013.  Plaintiffs' Response in Opposition

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

to Defendants' Motion for Summary Judgment (Doc. #159) was filed on October 15, 2013. Also before the Court is Plaintiffs' Motion for Summary Judgment and Finding of an Attorney Client Relationship (Doc. #146) filed on September 30, 2013. Defendants' Response in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. #164) was filed on October 15, 2013. Thus, the issues raised are now ripe for review.

## BACKGROUND

This dispute involves allegations for breach of fiduciary duty and legal malpractice. (Doc. #2). Plaintiff, Southern Gardens Citrus Processing Corporation ("SGC") is a company that processes citrus fruit and produces orange juice and related products in Hendry County, Florida. (Doc. #2, p. 2). Plaintiff, A. Duda & Sons, Inc. ("Duda") is a company producing orange juice in Hendry County, Florida.

There is a long history of United States and Brazilian competition in the orange juice production market in the United States. (Doc. #2, p. 2). Over the past two and a half decades, orange juice producers in Brazil have periodically sold in the United States orange juice at less than fair market value. (Doc. #2, p. 2). In response, government entities have enacted orders mandating that monies be paid as anti-dumping duties by the Brazilian orange juice producers into a fund from which several United States orange juice producers may be reimbursed for lost profits due to the inability to compete with the sales price of Brazilian orange juice. (Doc. #2, p. 2).

In July of 1982, Florida Citrus Mutual ("FCM"), an association of Florida orange growers, filed a petition claiming that the Brazilian government was subsidizing frozen concentrate orange juice exports. (Doc. #2, p. 2). The U.S. Commerce Department initiated an investigation, and eventually issued a preliminary determination that the

Brazilian government was subsidizing local producers. (Doc. #2, p. 2). On May 9, 1986, FCM filed an anti-dumping petition against frozen concentrated orange juice from Brazil before the U.S. International Trade Commission. (Doc. #2, p. 2). Preliminary and final determinations were affirmative showing that Brazilian orange juice was being sold at below value in order to monopolize the orange juice industry in the United States. (Doc. #2, p. 2). The National Juice Producers Association took the position that FCM did not have standing to bring the petition, so it became necessary for the individual producers of orange juice in the United States to become plaintiffs in the administrative proceedings before the U.S. International Trade Commission. (Doc. #2, p. 3). The law firm of Barnes Richardson & Colburn ("BRC") and attorney Matthew T. McGrath, a lawyer with BRC, acted as counsel for FCM and also represented individual orange juice producers in various administrative proceedings. (Doc. #2, p. 3).

In October of 2000, the Continued Dumping and Subsidy Offset Act of 2000 ("the Act"), also known as the Byrd Amendment, was enacted which provided that assessed duties pursuant to an anti-dumping order must be distributed to affected domestic producers. (Doc. #2, p. 3). Plaintiffs in this case, along with other domestic producers of orange juice, qualified under the Act. (Doc. #2, pp. 3-4).

In 2007, the U.S. Customs & Border Protection required that the anti-dumping duties which had been collected would then be available at a future date to be paid to Florida citrus growers who lost profits due to the Brazilians flooding the market with underpriced orange juice. (Doc. #2, p. 6).

Plaintiffs claim in this legal malpractice case that BRC and BRC attorney Matthew McGrath failed to timely notify Plaintiff, Southern Gardens, of their need to file

Certifications to Claim a Distribution of Continued Dumping and Subsidy Offset and Certifications in 2008, 2009, and 2010 ("Byrd Certifications"). (Doc. #2, p. 7). Additionally, the Complaint alleges that since Plaintiffs were not timely notified and was otherwise unaware of said filing deadlines, no Certifications were filed which legally precluded them from their proportionate share of the available funds. (Doc. #2, p. 7). Plaintiffs contend that BRC notified FCM, along with several other members of the Florida citrus industry about said annual notices, yet they conspicuously failed to notify Plaintiffs of the application deadline to their detriment. (Doc. #2, p. 7).

## STANDARD

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 U.S. 2505, 91 L. Ed. 2d 202 (1986). Similarly, an issue is material if it may affect the outcome of the suit under governing law. Id.

The moving party bears the burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding whether the moving party has met this initial burden, the Court must review the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party. Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999). Once the Court determines that the moving party has met its burden, the burden shifts and the non-moving party must present specific facts showing that there is a genuine issue for trial that precludes summary judgment. Matsushita

Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial." Demyan v. Sun Life Assurance Co. of Canada, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)). Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant the summary judgment. Celotex, 477 U.S. at 322-23. Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied. Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

## DISCUSSION

The Court finds the following undisputed summary judgment facts: In or about 1986, Defendants BRC and McGrath represented FCM in connection with its petition to the United States Department of Commerce and the International Trade Commission for the institution of an anti-dumping order against Frozen Concentrated Orange Juice ("FCOJ") produced in Brazil and dumped on the United States market at less-than fair market value. (McGrath Dep. 13:7-14). This petition was successful and Anti-Dumping Order A-351-605 was entered against Brazilian produced FCOJ in or about 1987, which mandated that Brazilian orange juice producers pay anti-dumping duties upon importing their products to the U.S. (Id.). In October of 2000, the Continued Dumping and

5

Subsidy Offset Act of 2000 (the "Act"), also known as the Byrd Amendment, was enacted which provided that duties assessed pursuant to an anti-dumping order could be distributed to affected domestic producers as opposed to kept by the Government. (Doc #74, p. 3 citing Doc. #2. p. 3.).

In 2002, because FCM was ineligible to file Byrd Certifications itself, FCM's then-CEO, Andy LaVigne, sent a memo to FCM's Executive Committee dated August 7, 2002, whereby Mr. LaVigne explained that although FCM was ineligible to file Byrd Certifications, individual orange juice producers could do so then remit the distribution to FCM in support of FCM's various activities to benefit the industry and to defray FCM's legal expenses in these endeavors. (Doc. #154-1). FCM's Executive Committee adopted Mr. LaVigne's plan to provide free legal assistance to co-petitioner orange juice processors, despite the fact that some of them were not members of FCM, in exchange for remittance to FCM of a portion of whatever Byrd funds those companies might receive. As a result, on August 15, 2002, Mr. McGrath sent a memo to representatives of SGC, Florida's Natural (also known as "Citrus World"), Duda, and Peace River proposing to assist those companies in filing Byrd Certifications in exchange for each company's agreement to issue a check to FCM in the amount received from Customs for the Byrd Certifications. (Doc. #154-2). Defendant McGrath testified that he has represented SGC and Duda at various times and that they have filed numerous documents with the International Trade Commission on their behalf. (McGrath Dep. 18:2-7; 131:4-12).

According to Duda's Chief Operating Officer, Palmer Barton Weeks, Duda worked together with Cortney Morgan, an attorney at BRC, to prepare Duda's 2002

Byrd Certification. (Weeks Dep. 121:5-7). Ms. Morgan informed Mr. Weeks of what information was required for the Byrd Certification, including instructions to determine the amount of qualifying expenditures claimed. Mr. Weeks gathered the information and included it in the Byrd Certification then sent the form to BRC to file it with Customs. (Id. at 121:14-24).

A similar process was repeated in 2003 whereby Duda took its 2002 Byrd Certification, deducted the amount of the distribution it received in 2002 from its total amount of qualifying expenditures claimed in 2002 and then sent the Byrd Certification to BRC for review and filing with Customs. (Weeks Dep. 125:18-126:1). Duda received $31.18 for its 2003 Byrd Certification of which none was forwarded to FCM. (Id. at 128:10-12). The same process was repeated again in 2004 whereby Duda revised its Certification to deduct its 2003 distribution from its 2004 Certification and sent to BRC for review and filing with Customs. As a result, Duda received a 2004 distribution of $27,822.21. (Weeks Dep. 130:3-17).

In 2004, FCM filed a second anti-dumping action against not-from concentrate as well as concentrated orange juice from Brazil. (Sparks Dep. 63:3-8). Duda and Citrus World again joined FCM as petitioners to establish industry support and SGC also joined as a petitioner for the first time. (McGrath Dep. 25:10-26:8). Defendants' efforts were successful and a second anti-dumping order was issued against "Certain Orange Juice from Brazil" under anti-dumping order #A-351-840. As a result of this second Order, additional anti-dumping duties were collected and became available for disbursement under the Act in 2007.

In 2005, Duda completed its Certification on its own as indicated by a modified signature block for Mr. Weeks and submitted it to BRC for review and filing. (Weeks Dep. 132:20-24). Duda did not contact either FCM or BRC to inquire as to its eligibility to file Byrd Certifications in 2006. (Weeks Dep. 136:19-25).[2]

On June 25, 2007, FCM's new CEO, Mike Sparks, sent an email to a list of "Growers and Friends" to notify them that FCM would be hosting a meeting on June 28, 2007, to provide its members (and non-members in the case of Duda and SGC) with information on how to complete Byrd Certifications. (Doc. #154-4). Mr. Sparks also stated that FCM would make its attorney, Mr. McGrath, available to review the process and explain the Byrd Certification form. (Id.).

SGC's president, Rick Kress, attended the June 28, 2007 meeting and obtained all of the information necessary to complete SGC's Byrd Certifications from Mr. McGrath. (Kress Dep. 104:11-17). Mr. Kress then emailed his staff on July 2, 2007, with instructions for completing SGC's 2007 Byrd Certification. (Doc. #154-5). Based upon the information in Mr. Kress' email, SGC completed its 2007 Byrd Certification and submitted it to FCM, which corrected an error and then either forwarded the Certifications to Defendants for submittal to Customs or submitted the Certifications directly to Customs. (See Doc. #112). It is unclear exactly how SGC's 2007 Byrd Certifications were submitted to Customs and Border Protection because they contained an error which required correction at FCM's offices; as a result, SGC's Certifications were not aggregated together with the Certifications from other FCM members and were instead handled separately.

_____

[2] It is Plaintiffs' position that BRC failed to notify Duda of the deadline in 2006.

On July 10, 2007, Mr. Weeks sent an email to several Duda employees, including Annie M. Hrncir (Gainey), Duda's associate in-house counsel who had previously completed Duda's prior Byrd Certifications, in which he described Duda's eligibility to submit Byrd Certifications in 2007 under the new order. (Doc. #154-7). Mr. Weeks also expressed his desire for other Duda employees to handle this matter as his responsibilities had shifted since his previous participation in 2005. (Id.). Ms. Hrncir then emailed BRC attorney Cortney Morgan on July 17, 2007, requesting assistance in completing the Byrd Certification forms, which Ms. Hrncir stated she had already located online. (Doc. #154-8). On July 18, 2007, Ms. Morgan replied, forwarding copies of Duda's previous Byrd Certifications and explaining that the 2007 Certification under the FCOJ order should mirror the same information as the prior Certifications with a revision for the amount previously received. (Id.) After several more rounds of communication, Ms. Hrncir also completed Duda's Byrd Certification under the Certain Orange Juice Order and sent final copies of both Byrd Certifications to Ms. Morgan for submittal to Customs. (Id.).

In July 2007, Defendants drafted a letter to Customs to be signed by Duda and Southern Gardens objecting to any potential claim for Byrd Amendment funds that may be filed by another producer, Peace River Citrus, who did not support the petition and thus was not qualified. (Doc. #159-1).

On May 30, 2008, Mr. McGrath emailed Mr. Kress, Mr. Weeks, and Mr. Behr (of Citrus World) informing them that the deadline to file their 2008 Byrd Certifications was July 29, 2008, and attached the official Federal Register public notification of intent to distribute Continued Dumping Subsidy Offsets. (Doc. #154-10). The email stated:

"Here's the annual Byrd claim announcement.  The deadline is July 29.  We will send the estimated dollars available as soon as they release it."

On the next day, May 31, 2008, Mr. Kress asked a question in response to Mr. McGrath's email, in which he wrote:

> Matt-Thanx for the info.  Not sure that I fully understand all as I was not here and part of the history.  Am I correct that this does not apply to the last Byrd event?  Will wait to receive next round of info from you when ready and available.

(Doc. #152-3).

This question was answered by Mr. McGrath that same day and Mr. Kress testified that he understood SGC was eligible to file a Byrd claim under the "Certain Orange Juice" order even though it was ineligible to do so under the separate and distinct earlier FCOJ anti-dumping order.  (Doc. #154-11).  In discussing his follow-up email exchange, Mr. Kress testified as follows:

> Q: You were advised as to the deadline for your next Byrd claim [in 2008]. What didn't you understand?
> A: I was expecting Matt [McGrath] to come back with instructions, as he committed.
> Q: Instructions for what?
> A: The next Byrd filing. Just like he did on *(sic)* 2007.
> Q: Why would he need to provide you instructions if you knew how to complete the 2007 form?
> A: I can't answer that.

(Kress Dep. 121:12-20).

Both Mr. Kress and Mr. Weeks testified that Mr. McGrath's May 30th email put them on notice of the 2008 deadline for filing Byrd Certifications.  (Kress Dep. 115:12-19; Weeks Dep. 155:5-15).  Both Mr. Kress and Mr. Weeks testified that they did not calendar this deadline, write it down or record it in any way.  (Kress Dep. 121:21-23; Weeks Dep. 155:16-17).  Mr. Weeks testified that they also received the attached

Federal Register notice providing public notification of this deadline and Mr. Kress testified that he had received Federal Registers in the past and was familiar with their use. (Weeks Dep. 156:11-13; Kress Dep. 116:16). Finally, Mr. Kress testified that after completing his company's Byrd Certifications in 2007, they were capable of doing so again in future years without further instruction. (Kress Dep. 102:21-103:1).

On July 2, 2007, Mr. Kress sent an email instructing his staff to complete the Byrd Certification internally based on his detailed instructions, submit it to FCM for review, which then would be forwarded to Defendants for a final review. (Doc. #154-5). Mr. Kress noted that "[a]s there are questions that surface, we have the ability to contact Matt McGrath for clarification and assistance." (Id.).

With respect to Duda, Mr. Weeks forwarded Mr. McGrath's May 30, 2008 email notification to two members of his staff at Duda, specifically including Annie Hrncir, who had completed the 2007 Byrd Certifications. (Weeks Dep. 157:18-21; Doc. #154-12). In forwarding Mr. McGrath's notice, Mr. Weeks advised his staff not to print out the Federal Register notice and stated, "We will wait and see what the industry wants from us in terms of filing." (Id.). There was no further correspondence regarding the 2008 Byrd Certifications with Mr. McGrath or anyone else at BRC. (Id. 160:7-13). The deadline for the 2008 filing passed and neither SGC nor Duda made the filings. The filings were also not made in 2009 and 2010.

Mr. McGrath testified that he never told anyone at Duda or SGC that he was specifically not representing them as their lawyer in the filing certifications for Byrd Certification funds. (McGrath Dep. 43:2-15). When asked whether his firm agreed to file the certifications for submission for Byrd Certification funds on behalf of Duda and

SGC, Mr. McGrath testified that they agreed to review them as a courtesy that was offered by FCM to the industry.  (Id. at 33:24-34:12).

Florida Citrus Mutual's Chairman of the Board from 2008-2010, Vernon "Fran" Becker, testified that Mr. McGrath represented Duda when it was ready to file Byrd Certifications.  (Becker Dep. 45:11-21).

Mr. Weeks, Duda's CEO, testified that he considered BRC to be a specialist when it came to global trade law as it applied to the anti-dumping petitions and the Byrd Amendment Certifications.  He expected that BRC would act as the company's legal counsel in assisting in the filings.  He testified that BRC "portrayed themselves as representing us to various government agencies and held themselves out as being our legal counsel."  (Weeks Dep. 168:6-24).  With regard to the May 30, 2008 email from Mr. McGrath informing them of the annual Byrd claim announcement and attaching the Federal Register, Mr. Weeks testified that at that time Mr. McGrath was following the same process he had in 2002, 2003, 2004, 2005, and 2007 in notifying Mr. Weeks, on behalf of Duda, that another Byrd filing could be made.  He stated that Mr. McGrath put him on notice in 2008, but did not follow through and that he expected Mr. McGrath to get back in touch with him after the May 30, 2008 email because that had been the practice in the past.  Specifically, Mr. Weeks testified that "[Mr. McGrath] would let us know whether or not there were sufficient funds available to warrant a filing and if there were, here's the deadline, here's the notification.  Fill out the form."  (Weeks Dep. 176:20-25; 177:1-24).  He stated that he relied on Mr. McGrath to tell them.

Mr. Kress, SGC's president, testified that he worked closely with BRC, specifically Mr. McGrath, on the anti-dumping petition and then through Mr. McGrath on

the Byrd filings in 2007.  It was his testimony that Mr. McGrath confirmed with him in 2008 that he would let him know at a point in time when the next Byrd filing would be available for certain orange juice dollars.  He testified that it was his understanding that he was going to continue to represent SGC with regard to the Byrd Amendment Certifications.  It was his impression from the 2008 emails that at some point in time Mr. McGrath would let him know when the next work needed to be done for the Byrd filings. (Kress Dep. 108:25-109:24).

Dr. Behr, Citrus World's president, testified that Mr. McGrath assisted with his office's filings of the Byrd certifications in 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, and 2011.  In each instance the application was completed and sent to Mr. McGrath for filing.  They were not filed independently of Mr. McGrath.  (Behr Dep. 44:6-20; 58:18-59:3).

The Parties have now filed cross motions for summary judgment, raising the issue of whether an attorney-client relationship existed between the Parties with regard to the 2008, 2009, and 2010 Byrd Certification filings such that a duty of care existed regarding the filings.  Defendants do not dispute that an attorney-client relationship existed with respect to obtaining and maintaining an anti-dumping order against certain orange juice from Brazil.  They argue that Plaintiffs cannot prevail on a legal malpractice claim because they must prove that the attorney-client relationship existed as the precise matter at issue in the litigation – the Byrd Amendment filings in 2008, 2009, 2010 – and record evidence shows otherwise.  Defendants allege that an attorney-client relationship did not exist with respect to perpetually providing Plaintiffs with annual notifications of the deadline for filing Byrd Certifications.  They argue that summary

judgment is appropriate because Plaintiffs' own conduct negates their claims and Plaintiffs have failed to offer competent evidence as to the standards of care which they contend Defendants owed. Defendants fulfilled their alleged duty by providing timely notice in 2008. Finally, Defendants argue that Plaintiffs' claims for the 2008 Byrd Certifications are barred by the statute of limitations. Plaintiffs respond, and cross move for summary judgment on the attorney-client relationship issue, that the course of conduct between the Parties establish that an attorney-client relationship did exist with respect to the Byrd filings and that the Court should find as a matter of law that a relationship in this regard did in fact exist.

Under Florida law, in order to prevail on a legal malpractice claim, "a plaintiff must establish the existence of three essential elements: (1) that the defendant attorney was employed by the plaintiff; (2) that the defendant attorney neglected a reasonable duty owed to the plaintiff; and (3) that such negligence was the proximate cause of loss to the plaintiff." Olmsted v. Emmanuel, 783 So.2d 1122, 1125 (Fla. 1st DCA 2001). "The test Florida courts have used to determine whether a lawyer-client relationship exists in the absence of a formal retainer 'is a subjective one and 'hinges upon the client's belief that he is *consulting* a lawyer in that capacity and his *manifested intention* is to seek professional legal advice.' However, '[t]his subject belief must … be a reasonable one.'" Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1281 (11th Cir. 2004) (emphasis in original) (quoting Bartholomew v. Bartholomew, 611 So.2d 85, 86 (Fla. 2d DCA 1992) (internal quotation omitted)). The reasonableness of a client's subjective intent requires that the client do something to plainly show that intent to the attorney. Id. at 1284. In this case, there was no retainer agreement, but "the

existence of a formal retainer agreement is not essential" to finding an attorney-client relationship, Eggers v. Eggers, 776 So.2d 1096, 1099 (Fla. 5th DCA 2001), and a client need not pay a fee to form an attorney-client relationship. The Florida Bar v. King, 664 So.2d 925, 927 (Fla. 1995). "The determination of an attorney-client relationship is a question of fact." Valliere v. Florida Elections Com'n, 989 So.2d 1242 (Fla. 4th DCA 2008).

Defendants do not dispute that Plaintiffs interacted with Defendants on various segments of the anti-dumping litigation, including the initial petition, periodic questionnaire responses and administrative and sunset reviews in addition to Byrd Certifications. The record shows that Plaintiffs' and Defendants' communications regarding the Byrd filings began in 2002. The Court has examined the record evidence in this case regarding the conduct of the Parties and their interactions specifically with respect to preparation of filing Byrd Certifications to determine whether Plaintiffs' position that an attorney-client relationship existed in this regard was reasonable. On August 15, 2002, Mr. McGrath sent a memo to representatives of SGC, Citrus World, Duda, and Peace River proposing to assist those companies in filing Byrd Certifications in exchange for each company's agreement to issue a check to FCM in the amount received from Customs for the Byrd Certifications. (Doc. #154-2). Defendants argue that the undisputed facts show that Plaintiffs understood that Defendants were providing assistance with Byrd Certifications only upon request and on a purely "as needed" basis as well. As a result, Defendants argue that Plaintiffs cannot now claim that Defendants had a duty to proactively do anything more than notify them of the filing deadline without request, much less that such expectations were never communicated to Defendants.

Plaintiffs have presented evidence that there was a history of consultation with the Defendants on anti-dumping petitions as well as the Byrd Certification filings such that Plaintiffs have raised a genuine issue of material fact concerning whether there was an attorney-client relationship with respect to the Byrd filings such that Defendants owed a duty of care to the Defendants as their counsel. Both Mr. Weeks and Mr. Kress testified that it was their belief, based on past dealings, that Mr. McGrath and his firm was going to handle the Byrd filings and they believed that Mr. McGrath would get back in touch with them regarding the 2008 filings based upon the history of conduct. While Defendants argue that Plaintiffs' failure to respond to Defendants' notifications affirmatively communicated their lack of interest in pursuing an attorney-client relationship with Defendants for Byrd Certifications, this is an argument to be made to a jury in defense of why Defendants believe Plaintiffs should not recover. But at this point in the litigation there is a genuine issue of material fact[3] as to whether Defendants had a continuing duty to Plaintiffs to notify them as their legal counsel for the 2008, 2009, and 2010 Byrd filings, especially given the assistance provided by the Defendants for the Byrd filings just one year earlier, in 2007.[4] Thus, Plaintiffs' claims for legal malpractice and breach of fiduciary duty may go forward.

---

[3] As the Court finds that there is a genuine issue of material fact regarding whether an attorney-client relationship existed for the 2008, 2009, and 2010 Byrd filings, Plaintiffs' request for the Court to decide this issue as a matter of law is denied as well.

[4] Defendants alternatively argue that even if their allegedly continuous duty was not extinguished for future years it is indisputable that Defendants complied with and in fact exceeded the standard of care set forth by Plaintiffs' purported expert for 2008 and therefore Defendants are entitled to summary judgment as to Plaintiffs' 2008 claims. Again, this Court finds that Plaintiffs have raised a genuine issue of material fact by putting forth testimony and evidence regarding the subjective beliefs of the Plaintiffs regarding the May 30, 2008 email and whether Mr. McGrath would in fact get back in touch with them based on past dealings. Thus, summary judgment on the 2008 filing is denied.

Finally, Defendants argue that Plaintiff's claim for damages in connection with their failure to file Byrd Certifications in 2008 is barred by the statute of limitations and thus any claim for monies in 2008 should be dismissed. Florida Statute §95.11(4)(a) requires that an action for professional malpractice must be brought within two years of when the cause of action was discovered or should have been discovered with due diligence. Defendants argue that Plaintiffs should have been aware of this cause of action in 2008 because of Mr. McGrath's May 30, 2008 email, and Plaintiffs must have been aware that Defendants failed to do more when the 2008 deadline for filing Byrd Certifications passed. Plaintiffs respond that if they knew of the damages at that time, they would have taken action to have their Byrd Certifications filed immediately which likely would have led them to discover that Defendants had terminated their legal representation without notice. Instead, that was not discovered for another two (2) years, in December 2010 when Plaintiffs were notified that there were monies distributed to orange juice producers in 2008, 2009 and 2010, arising out of the Byrd Amendment funds. Plaintiffs' argument is well taken. The evidence does not show at this point that Plaintiffs were aware they had a cause of action against Defendants beginning in 2008.

Accordingly, it is now

**ORDERED:**

(1) Defendants' Motion for Summary Judgment (Doc. #154) is **DENIED**.

(2) Plaintiffs' Motion for Summary Judgment and Finding of an Attorney Client Relationship (Doc. #146) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 28th day of October, 2013.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record